UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROMERO D. ELLISON,

                    Plaintiff,

        v.                                              Case No. 25-cv-134-pp

SHIRLEY Y. GODIWALLA and TRICIA WEISNICHT,

                    Defendants.

**ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 20) AND DISMISSING CASE**

Plaintiff Romero Ellison, who is incarcerated at Fox Lake Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants had violated his constitutional rights. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim based on allegations that the defendants had disregarded his complaints of ongoing severe pain after he received an injection of Kenalog in his wrist to treat carpal tunnel syndrome. Dkt. No. 9 at 6-7. The defendants have filed a motion for summary judgment. Dkt. No. 20. On March 17, 2026, the court issued an order requiring the plaintiff to file his opposition to the motion by April 15, 2026; the order stated that if the plaintiff did not file his response by that date (or provide an explanation for why he could not do so), the court would resolve the defendants' motion without input from the plaintiff. Dkt. No. 27. The court sent the order to the plaintiff at Fox Lake Correctional Institution; the Wisconsin Department of Corrections Offender

1

Locator indicates that the plaintiff remains confined at Fox Lake as of the date of this order. https://appsdoc.wi.gov/details/detail. The April 15 deadline passed several weeks ago, and the court has not received the plaintiff's response. As it said it would do in its March 17, 2026 order, the court will treat the defendants' motion for summary judgment as unopposed and will dismiss this case.

## I. Defendants' Motion for Summary Judgment, Dkt. No. 20

### A. Facts

The plaintiff was incarcerated at Fox Lake during the events described in the complaint. Dkt. No. 22 at ¶1. Defendant Shirley Godiwalla is employed as a physician with the Wisconsin Department of Corrections' (DOC) Bureau of Health Services. Id. at ¶2. Defendant Tricia Weisnicht is employed by the DOC as a nursing supervisor (also known as health services manager) at Fox Lake. Id. at ¶5.

The plaintiff has a treatment history pertaining to various injuries he sustained from playing basketball. Id. at ¶33. In 2012, while playing basketball, he sustained a left distal radius fracture to his wrist, which resulted in surgical repair in 2013. Id. at ¶34. The plaintiff continued to play basketball after his injury. Id. at ¶¶35-37.

On February 21, 2024, the plaintiff told Godiwalla that he had been having pins and needles sensations in his wrist and hand for a month. Id. at ¶38. Godiwalla ordered a consultation with neurology and x-rays of the plaintiff's left wrist. Id.  A February 23, 2024 x-ray of the plaintiff's left wrist

2

showed no obvious or acutely displaced fracture. Id. at ¶40. On May 31, 2024, the plaintiff was sent off-site for an electromyography (EMG) and nerve conduction study (NCS) of his left upper extremity for complaints of numbness and tingling. Id. at ¶41. He was diagnosed with left carpal tunnel syndrome. Id. On June 5, 2024, Godiwalla saw the plaintiff and made a physical therapy referral for stretching exercises of the plaintiff's hand. Id. ¶46. She also informed him that a Kenalog injection for his left carpal tunnel syndrome had been scheduled. Id.

On June 13, 2024, Godiwalla saw the plaintiff for the Kenalog injection and explained to him the risks, benefits and alternatives. Id. at ¶48. Because a Kenalog injection is meant to be given around the patient's nerve, before injecting, Godiwalla would position the needle to locate the correct injection point. Id. at ¶50. She would tell patients that they must inform her if they had a feeling of an electric current, which means that the needle has touched or is near the nerve; if the patient had such a feeling, she would withdraw the needle until the patient stopped feeling the electric current. Id. Once the correct injection point was identified, Godiwalla would inject the Kenalog with Lidocaine. Id. When Godiwalla was positioning the needle, the plaintiff informed her that he felt an electric current, at which point she withdrew the needle to the correct injection point before injecting the Kenalog with Lidocaine (used for local anesthesia). Id. at ¶¶51-52. Following the injection, the plaintiff was able to move his left wrist, and he reported that his pain had decreased to zero out of ten. Id. at ¶53. Godiwalla gave the plaintiff ice bags to apply to his

3

wrist, instructed him to wear a splint and scheduled a follow-up appointment. Id. at ¶¶53-54. The Kenalog injection to the plaintiff's wrist was properly and successfully performed. Id. at ¶¶55-57, 88.

On June 19, 2024, the plaintiff told RN Thompson that he had lost mobility to his left thumb due to numbness since receiving the Kenalog injection. Id. at ¶58. Upon examination, the plaintiff was able to perform circles with the thumb but could not bend it. Id. Carpal tunnel syndrome typically involves numbness, tingling and weakness in the fingers, which may affect thumb movement. Id. at ¶59. The fact that the plaintiff was able to perform circles with his thumb but was not able to bend it indicated that the issue was not directly associated with his carpal tunnel syndrome. Id. It indicated that the plaintiff had issues with his flexor muscle, as later shown on an MRI and ultrasound. Id.

Between June and August 2024, the plaintiff had at least five physical therapy appointments with PT Lentscher for his left hand and thumb. Id. at ¶60. The plaintiff's medical records from June 27, 2024 show that he had attempted to do pushups and apply pressure into his palm, upon which he would experience pain. Id. at ¶61. The flexor is the primary muscle responsible for flexing the thumb at the metacarpophalangeal joint. Id. at ¶62. Flexor muscle or tendon injuries often are sports-related, and the plaintiff's attempts to do pushups and apply pressure into his palm are possible explanations for his pain. Id.

4

On July 18, 2024, the plaintiff told Godiwalla that after the injection he was unable to use the left flexor muscle of his left thumb. Id. at ¶67. Godiwalla's examination revealed that the plaintiff had sensation on the left thumb with no paresthesia present, and that he had good power of the extensor tendon, but that he was unable to use the flexor of his left thumb. Id. Godiwalla ordered a consultation with off-site Neurology. Id.

On August 6, 2024, the plaintiff told Lentscher that his "wrist pain ha[d] decreased since receiving the Kenalog injection," and that he "[did] not experience pain in the wrist, hand or thumb when the [upper extremity was] at rest." Id. at ¶70. The plaintiff reported that he only had pain or discomfort when he tried to bend the distal end of his thumb. Id. Lentscher found no improvement in the plaintiff's active flexion in the distal thumb and noted some atrophy in the thumb and thenar eminence. Id. Lentscher discharged the plaintiff from physical therapy and noted that the plaintiff had a neurology consultation as previously scheduled by Godiwalla. Id.

On August 12, 2024, the plaintiff asked RN Thompson to give him something stronger than ibuprofen for his pain. Id. at ¶71. Thompson informed Godiwalla of this request, and Godiwalla responded that the plaintiff should take the Tylenol 500 mg, which Godiwalla had prescribed for ninety days, with the ibuprofen for additive effect. Id. at ¶¶72–73. Combining acetaminophen (Tylenol) and ibuprofen can often provide more effective pain relief than certain prescription opioids. Id. at ¶74.

On August 19, 2024, the plaintiff told Thompson that he was having pain from his left thumb to his wrist area, which felt like nerve pain. Id. at ¶75. He reported that he had tried Tylenol and ibuprofen together, with no improvement in the pain. Id. This was only about a week after Godiwalla instructed him to take the two medications together. Id. But in the plaintiff's case, it would have taken at least a month of consistent use of his pain medications as prescribed to determine whether they were effective. Id. at ¶76. One week was too short a time to draw a conclusion that the medications were not effective. Id. Thompson informed Godiwalla that the plaintiff was requesting something stronger for nerve pain. Id. at ¶78. Godiwalla already had an appointment with the plaintiff scheduled for August 27, 2024, and there was no report of severe pain that would warrant an emergency appointment. Id. at ¶79. She did not prescribe any different or stronger pain medication at that time. Id.

On August 27, 2024, the plaintiff told Godiwalla that he had pain over his left thumb and the thenar prominence, and that the pain was relieved by wearing a wrist brace. Id. at ¶80. He reported having pain when the distal tip of his left thumb was flexed. Id. He reported that the rest of his hand was doing well, and that the pain he had prior to his Kenalog injection was not present. Id. Godiwalla called the HSU scheduler to get an EMG and NCS scheduled for further examination. Id. at ¶81. She spoke with Lentscher about trying a different and better brace for the plaintiff. Id. She also placed an order for amitriptyline—a tricyclic antidepressant that is widely used to treat chronic

and neuropathic pain. Id. Amitriptyline generally is effective for nerve pain and is non-addictive, making it a safe option in correctional settings. Id. at ¶83.

On September 4, 2024, the plaintiff told RN Hill that his pain had not diminished after the Kenalog injection—this was contrary to what he told Godiwalla during his appointment with her on August 27, 2024. Id. at ¶84. Further, the plaintiff had been prescribed amitriptyline less than ten days prior to this visit. Id. On September 11, 2024, the plaintiff told Hill that he had a hot, burning pain when his thumb or hand was bumped. Id. at ¶85.

On September 22, 2024, Godiwalla informed Hill that she had referred the plaintiff to neurology. Id. at ¶87. As of October 21, 2024, the plaintiff also had an orthopedics referral in place. Id. at ¶90. On October 23, 2024, the plaintiff informed Godiwalla via an Interview/Information Request that the Tylenol was not helping his pain. Id. at ¶91. Godiwalla responded that she had placed a consultation with hand surgeons at the University of Wisconsin to better evaluate his condition. Id. at ¶¶91-92. She again instructed the plaintiff to take Tylenol and ibuprofen together for additive effect. Id. at ¶91. The plaintiff still had his amitriptyline prescription in place, which he had refused to take on numerous occasions since August 31, 2024. Id. at ¶95.

On October 10, 2024, the plaintiff submitted an Interview/Information Request regarding his alleged extreme pain, which was redirected to Health Services Manager Weisnicht. Id. at ¶124. Six days later, Weisnicht wrote the plaintiff a letter in response to this request, summarizing what she observed from his medical records regarding the treatment and care he received for his

7

hand pain. Id. at ¶125. She informed the plaintiff that his provider had placed an order for a consultation to offsite orthopedics; that the provider stated the plaintiff's pain was potentially related to the old fracture in his hand; and that the scheduler was working to arrange the offsite appointment. Id.

The next day, the plaintiff submitted another request to Weisnicht. Id. at ¶126. The request stated:

> I appreciate the correspondence dated "10/16/24" surrounding "DAI-2024-84334." Within the letter you addressed the physical therapy, the x-rays, the EMG and NCS, I was also placed on assessment/plan. What you didn't address or acknowledge was the pain that I am in. Could you please help me as I'm in constant pain?!

Id. Weisnicht responded: "The pain concerns can only be addressed with your provider. Please feel free to see your provider to address your pain concerns." Id. at ¶128. As of the date the plaintiff filed this lawsuit, the above-described letter and Interview/Information Requests were the only communications Weisnicht had with the plaintiff regarding his wrist and thumb concerns following his Kenalog injection. Id. at ¶129.

On December 18, 2024, the plaintiff was seen at UW Orthopedics, where Dr. Hennick found healthy blood flow with no sign of nerve damage. Id. at ¶98. But it was noted that the plaintiff had a problem with his thumb's ability to straighten on its own. Id. X-rays of the plaintiff's left thumb showed hyperextension at the interphalangeal joint, and the x-ray of his left wrist showed status/post distal radial fracture open reduction and internal fixation with stable hardware and wrist alignment. Id. at ¶101. Hennick noted a

8

concern for left thumb flexor pollicis longus (FPL) rupture. Id. at ¶101. The FPL tendon is responsible for flexion of the thumb at the interphalangeal joint. Id. at ¶102. A rupture occurs when the tendon is completely torn, leading to an inability to extend the thumb properly. Id. Common causes of FPL rupture include complication following volar plating of distal radius fractures due to attrition, wrist trauma and repetitive activities that exert excessive strain on the tendon. Id. This would be consistent with plaintiff's medical history, because he received surgical repair for his left distal radius fracture in 2013 that entailed fixation with volar plate. Id. at ¶103. Hennick recommended an MRI of plaintiff's thumb to evaluate the tendon and advised that if the tendon was no longer intact, the management options would include repair, reconstruction or tendon transfer. Id. at ¶104.

On January 3, 2025, the plaintiff asked RN Rondeau to give him "something more for the pain" in his left thumb. Id. at ¶105. He reported that his thumb ached frequently but had a sharp pain if bumped. Id. He reported that the pain was located from the base of the thumb to the first knuckle. Id. Rondeau gave the plaintiff lidocaine cream to help ease his discomfort. Id.

On January 29 and February 7, 2025, Godiwalla renewed the plaintiff's duloxetine, a prescription medication that can be used to treat chronic musculoskeletal pain and neuropathic pain, for the pain in his left wrist and thumb. Id. at ¶¶110-11. Between February 2025 and January 2026, the plaintiff refused duloxetine on at least seventy-one occasions and refused amitriptyline on at least eighty-eight occasions. Id. at ¶¶112-13. After the

plaintiff filed this lawsuit on January 27, 2025, in addition to the continual duloxetine and amitriptyline prescriptions, Godiwalla continued to place referrals for the plaintiff to be seen by offsite specialists in neurology, radiology and Orthopedics. Id. at ¶114.

As health services manager, Weisnicht does not have the authority to prescribe medication or override treatment decisions of physicians. Id. at ¶132. When the plaintiff informed Weisnicht of his concerns, an offsite referral and prescriptions for pain medications already were in place. Id. at ¶133. Based on Weisnicht's review of the plaintiff's medical records, she also found the assessment and plan reasonable. Id. HSU staff had provided the plaintiff with various options in attempts to address the pain in his hand. Id. As of October 10, 2024, the plaintiff already had refused amitriptyline on at least three occasions. Id. Weisnicht did not believe there were any other options that could be pursued until further evaluation was made by offsite specialists. Id.

B.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A

10

dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

C. Discussion

The defendants contend that the court should dismiss the plaintiff's Eighth Amendment claim because there is no evidence that the defendants were deliberately indifferent to his ongoing pain. Dkt. No. 21 at 5. The defendants also contend that defendant Weisnicht is entitled to judgment in her favor because she was not personally involved in determining the plaintiff's plan of care or treatment. Id. at 19.

Prison officials' deliberate indifference to an incarcerated individual's serious medical needs violates the Eighth Amendment. Riley v. Waterman, 126 F.4th 1287, 1295 (7th Cir. 2025) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference claim, the plaintiff must prove (1) that he had an objectively serious medical condition (2) to which prison officials were "deliberately, that is subjectively, indifferent." Id. (quoting Johnson v. Dominguez, 5 F.4th 818, 824 (7th Cir. 2021)).

Prison officials are deliberately indifferent when they know of and disregard a substantial risk to an incarcerated individual's health. Id. (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). The chosen treatment plan must "represent[ ] so significant a departure from accepted professional standards or practices that it calls into question whether the [provider] actually was exercising . . . professional judgment." Id. (quoting Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)). The court looks "at the totality of an inmate's

11

medical care when considering whether that care evidences deliberate indifference to serious medical needs." Id. (quoting Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)). A medical professional's persistence with an ineffective course of treatment can constitute deliberate indifference. Id. at 1296 (citing Greeno v. Daley, 414 F.3d 645, 654-55 (7th Cir. 2005) (reversing grant of summary judgment where defendants refused to change incarcerated individual's medications despite his repeated reports that it wasn't working)).

The undisputed facts show that the defendants were not deliberately indifferent to the plaintiff's ongoing pain. After Godiwalla administered the Kenolog injection on June 13, 2024, she addressed the plaintiff's wrist and thumb concerns by referring him to physical therapy, offsite neurology and orthopedic treatment. Godiwalla also attempted to manage the plaintiff's pain by prescribing different medications. Godiwalla's ongoing treatment and assessment of the plaintiff's medical needs is the "antithesis of deliberate indifference." Harper v. Santos, 847 F.3d 923, 927 (7th Cir. 2017). The plaintiff did not always take his prescribed pain medication. Godiwalla cannot be found to be deliberately indifferent to the plaintiff's pain where the plaintiff refused to follow her pain treatment recommendations. See Pinkston v. Madry, 440 F.3d 879, 892 (7th Cir. 2006). Godiwalla did not act with deliberate indifference.

When the plaintiff complained to Weisnicht that he still was experiencing pain, she told him to address his concerns with his medical provider. Weisnicht did not have the authority to override Godiwalla's treatment decisions. Nor can

she be held liable because she was not personally involved in the plaintiff's medical care. See Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996).

A reasonable jury could not conclude that the defendants violated the plaintiff's constitutional rights. The court will grant the defendants' motion for summary judgment and dismiss the case.[1]

## II. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 20.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If

---

[1] Based on the court's determination that the plaintiff has not established a constitutional violation, the court need not address the defendants' contention that they are entitled to qualified immunity.

the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 14th day of May, 2026.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

14